Case number 18-7158. Sylvia Singletary, D.V.M., appellant, v. Howard University. Mr. Shoemaker for the appellant, Ms. Curry for the appellant. May it please the Court, good morning. My name is Jamie Shoemaker. I'm an attorney with the Patent Board of Manhattan & Diamond State in Newport News, Virginia. I represent Dr. Sylvia Singletary on this appeal. I would like to begin by focusing on the statutory standard governing this appeal. The retaliation provisions of the False Claims Act were amended very significantly in 2009 and 2010. It appears that Congress sat back and watched the case law develop under the furtherance of an action standard. The prior standard basically said that an employee had to be retaliated against because they acted in furtherance of an action under the False Claims Act. The case law developed in such a way that it restricted the scope of protected activity that was applied in the protection of those seeking to stop fraud. Various courts interpreted it differently. Judge McFadden in this case states it pretty succinctly at the top of page 6 of his decision where he says, protected activity requires quote, investigating matters that reasonably could lead to a viable False Claims Act case. Not simply lead to a False Claims Act case, but to a viable False Claims Act case. That standard is no longer the standard. Congress changed the statute as of 2010. There were some machinations. The 2009 amendment was incomplete. They changed it again in 2010. Now the standard I assert is this. An employee is entitled to relief under the anti-retaliation provisions of the False Claims Act when they suffer retaliation because of any effort to stop actual fraud or we have to show that there is actually going to be or ongoing violation. I talk about that in my brief. If they have a reasonable belief that what they are doing is stopping fraud, they are protected under this statute. That comports with the body of law that has developed in all, virtually all the other retaliation statutes. So let's talk about that for a second, whether there is a reasonable belief based on the allegations and the complaint that she was stopping fraud. And by stopping fraud, it's not just stopping fraud in the air. It's stopping the submission of fraud, of false or fraudulent claims to the government, right? That's what the statute gets at. And I know fraud is just used as shorthand, but I just, it's not like if there was fraud that was entirely unrelated to the submission of a claim to the government. That would be enough. Right. It has to be fraud connected to the submission of a claim to the government. Yes, sir. And then the question becomes, do the allegations and the complaint get to that, the reasonable belief about the submission of a false or fraudulent claim to the government? And what you point to, I think understandably, are the allegations and the proposed complaint that speak in terms of her concern about Howard being out of compliance with the terms and conditions under which it was receiving grant money. And so in my mind, the question becomes, what's the gap between noncompliance with the terms and conditions under which Howard was receiving grant money, on one hand, and on the other hand, the submission of false or fraudulent claims by Howard to the federal government? Well, Judge, my complaint goes into the types of fraudulent claims, the types of violations of the False Claims Act. And among the types of violations of the False Claims Act, there's a species of violation called an implied false certification and an express false certification. These were, Judge, certainly at least implied, but they were, I think, express. But Judge, I don't think... And where's that in the complaint? Right. You don't allege that they made false certifications. You allege that they weren't in compliance with grant conditions. No, Judge, I think, I did allege that there are false certifications in the proposed Second Amendment complaint. So where is that? Because the part that gets closest... Because to me, this is where the action in the case is. Is there a gap between noncompliance with terms and conditions and submission of a false or fraudulent claim? And the part that got closest to submission of a false or fraudulent claim, I thought was paragraph 43 that speaks in terms of certifications made. And that's where I'm... At least that's where I'm focused, and it sounds like... Me too. And the closest I get from that is they made representations, they had to make representations to get grants, and the representations were false. False is different from fraudulent. Judge Katz, I think it's fairly clear in the body of case law that there's not a... With all respect to the assertion, there's not a talismanic standard here where we have to say fraud. And I don't even think there's a standard where she has to contemplate the False Claims Act when she makes an effort to stop fraud. That's definitely true. She doesn't have to contemplate that. So in my complaint, I do say this. I do say, Howard University made certifications to the National Institutes of Health and other federal agencies that the laboratory animals in question in this matter were being maintained and cared for under certain federally mandated ambient living conditions. These certifications were necessary for Howard to receive and retain grant monies that they in fact received from the United States and retained throughout the relevant time period. These representations and specific representations pursuant to which Howard promised NIH to maintain the laboratory animals in a humane and objectively identified temperature range. The representations ultimately made by Howard to NIH on this subject were false. So when you're talking about ultimately, what I'm trying to figure out is there was... I don't know how long the period of... How long was the period that she was complaining, at least internally, before the report to NIH? From mid-summer of 2013 approximately to April of 2014. So eight or nine months or something like that. During that time period when she was complaining internally and up to and then including her complaint to NIH. During that time period, did Howard University submit a claim to the... Some of the paperwork to the government in order to obtain or retain or continue to receive funds that made representations about animal welfare conditions including this specific one? Judge, I don't know the answer to that question. But at the pleading stage, at the pleading stage of a False Claims Act retaliation case, you're almost imposing a 9B standard on... That's not a 9B standard. That's trying to find out whether... During the time that this complaint alleges, because we don't know what happened before she got there, then your argument is that she remedied it. So during that time period, these conditions were not being maintained. And then don't you also need to show that there was some sort of false claim to the government that happened during that time period? I don't know if there's quarterly reports, annual reports. I don't know what happens. Judge, first, I think it's reasonable to infer from the pleading that such I think it's reasonable to infer from the allegations that they were... You just said you don't know. How can we infer if you don't know? Ma'am, it was a requirement that these certifications be made. And how often? Just when they first got the grant money? That's what I'm, at least I'm struggling with here, for the others, but that's what I'm struggling with. Right, because I think the problem is if there's a certification made at time one, and then it turns out to be false, that doesn't mean there was a false certification made after that. All it's telling you is that there was a certification made at some point about temperatures that would be maintained. And then at some point, it turns out that condition is not being complied with. But that doesn't tell you that then there was a false certification made after that, which would be what's, I think, critical in determining whether there was a violation of the false claims. There's also an assertion in the complaint that the institutional official has an obligation to report repeated inability to house these animals within the ambient temperature range to OLAW. Right, but that's not the submission of a false or fraudulent claim. That may be... I think the cases are pretty clear that a violation of federal law, federal expectations isn't enough. It has to relate to the submission of a false or fraudulent claim. And it's not to say that you're necessarily not there. It's just to say that that seems to me to be where the potential gap is. Right. Well, Judge, I would recur to what I said at the beginning. The amendment, any effort to stop fraud, it doesn't... I think when Congress saw these strictures developing in the body of case law, they said, wait a minute, we're going to make this real clear. Yeah, in furtherance of an objection, we can do it, but we are going to protect any effort, any effort to stop fraud. To stop fraud, not to secure compliance with underlying regulatory schemes like the animal safety schemes. But Judge, any fair interpretation of our complaint has to conclude that these certifications were a condition of getting and retaining federal money. And retaining federal money. That's important to me. I don't know when they were made. We don't know whether it's an absolute compliance standard or a substantial compliance standard. We don't know anything about that. Judge, I think that is more appropriate. I don't think I'm required to plead to that level of detail. I think we have pled that certifications were required to get the grant money and that failing to maintain the ambient air conditions were in violation of those certifications. The False Claims Act, the body of law of the False Claims Act clearly states, and we connected it to the money, the getting of the money and the retention of the money. I don't think we're obligated to plead. The certification was made on September 1st and they got the money on September 15th. I think that is a pleading standard that is impractical for the typical whistleblower. I'm just trying to understand how this scheme works aside what the plaintiff has to allege or not. So you said retaining money is an important aspect of this and that's what I'm trying. Can you just explain to me by pointing to the guide or the handbook or regulation or statute how this works? At some point, Howard made these submissions and got money. Presumably this is something they do on a regular basis. I don't know how regularly. Or do they have to make quarterly compliance reports or anything like that. Anything you can report to me just to help me understand how this money flow coincides with these representations and in particular to explain the retention point that you said was so important. I want to make sure I understand that. There's a provision within 31 U.S.C. 3730, prior to the H section I believe, that talks about it being a violation of the False Claims Act to retain monies to which the government contractor or the grantee is provided. When they retain those monies in contradiction of a certification made to the grant authority. It's toward the beginning I believe. Okay. Maybe on rebuttal you can help point us to that. For me at least. So your view is that any time a grant recipient finds out that they're out of compliance with a condition of receiving funds, they can't retain the funds. The False Claims Act bars retain. They have to give it back. Is that what happens or how does it work? Yes, Judge. As a practical matter, there is a materiality standard that governs the statute when it comes to recovering under a QTAM claim or the government DOJ coming in to recover money. But that materiality standard cannot apply to the retaliation provision or pleading the retaliation provision. Congress added any effort to stop fraud. And I think we've pled that. I don't think these strictures that apply to the underlying... You don't think fraud in the context of this statute means violation of the False Claims Act? I do, Judge. I do. So then we need the knowing submission of a false claim. Judge, the law, the retaliation law in every other statute that I know of with a retaliation provision says that if the whistleblower or the party engaging in protected activity had a reasonable belief... That there was a knowing submission of a false claim. That there was fraud. I don't think the layman, I don't think Congress is requiring layman whistleblowers to have that level of understanding of what has occurred. Well, at least it has to be fraud in connection with the submission of a claim. That at least has to be. I take your point about reasonable belief. I think it's true that we don't expect laypersons to be lawyers who can parse their way through a statute. So there's a reasonable belief overlay for the retaliation claim. But it has to be fraud in connection with the submission of a claim. Judge, the phrase submission of a claim I think is too restrictive. I think in this case when we allege that these false certifications were made to get money, and Sylvia Singletary went to her superiors and said, hey, we're in violation of these grants. We're telling NIH these animals are being housed within this ambient temperature ban, and we're not doing it. And accepting this money is wrong. That is a fair interpretation of our pleading. And that is a violation of the amended, we contend, the amended retaliation provisions. But just to go back to the language, the actual language is, new language in the amended statute that you invoke is efforts to stop, and then it doesn't say fraud in the air. It says one or more violations of this subchapter. Subchapter being the False Claims Act. Judge, I think that using, when you review the False Claims Act in its entirety, I think it's clearly intended to stop fraud. But certain kinds of fraud. I don't think the layman whistleblower is required to make that distinction, to have the protections of this statute. I don't think Congress could possibly have intended that. The expanded definition of protected activity on its face speaks about violations of the statute. Yes. And it's one thing to say that you impose the reasonable belief overlay that Judge Srinivasan mentioned, but it's quite another to say that the retaliation provision just picks up fraud or falsity in the air. It just doesn't say that. Well, Judge, first, I would contend that even if it is restrictive, as you say, we have pled that. We have pled that. We have pled these certifications are covered by the False Claims Act. I don't think we have to come in, chapter and verse, almost on a Rule 9 level. Do you have anything besides Paragraph 43 that you want to point us towards on that? We've talked about that one. What I am citing from is the Joint Appendix, page 137. Which is Paragraph 43. Yes. I mean, I thought that was your best paragraph. That's probably right, Judge. Okay. You've read the cases, and you know that it's not every violation of a regulation or requirement that's incorporated in a federal contract is deemed to be a false claim for purposes of this provision. Nor could it reasonably be believed that any violation of any condition or requirement was by itself going to be a false claim. So what I'm struggling with is how do we know? She certainly identified violations of contractual and regulatory requirements. She certainly identified that. And she certainly said you all promised when you got this money that you were going to comply with these things. And we are not complying. But how do we know it moved from beyond? What is your argument as to how we know it moved beyond the realm of identifying regulatory violations to identifying or stopping what she thought was coming down the pike here, a submission of a false claim? Well, she clearly believed. A fair interpretation of our pleading is that Dr. Singletary clearly believed Howard received and retained money under false pretenses. She clearly believed that. I think that's a clear, fair reading of our pleading. And I think that is also – I guess I'm having trouble seeing. We don't know when they got the money, and we don't know when these – the conditions were as promised, and then things went awry while she was there. How do we know – how did she have a reasonable belief, or how do we know from your complaint, that actually at the time Howard first got this money, their representations weren't accurate? Judge, the complaint doesn't address it to that level of detail. I can see that. All right. Well, maybe you can help with your retention stuff on rebuttal. That might help. Thank you, Counsel. Thank you all. Ms. Curry. Good morning. May it please the Court, my name is Jennifer Curry. I'm with the law firm Baker Donaldson. I'm here on behalf of the appellee, Howard University. To touch on what Your Honors and Counsel were just speaking on, Singletary has failed to identify any purported FCA violation, and the vague term – Well, explain to me how this works. Does Howard University – what are the time periods for the money? Do they have to make quarterly or semiannual or annual reports that say, here's what we're doing, we're in compliance? There are annual reports that are required to be made to the NIH. Was one of them made during this 11 or 9-week period? Not that we are aware of, Your Honor. Not that you're aware of? I know it's not a complaint, I'm just asking you when you do it, because it covered the end of the year and the beginning of the year, and it covered the fiscal year. So I'm trying to figure out why it wouldn't have encompassed. Well, there are several, frankly, NIH grants that the university receives. At this point, we're not even sure what grant Ms. Singletary was referring to in her complaint, and she hasn't alleged it. The only information that we really have of an incident that even occurred during the course of Ms. Singletary's employment was the April 15, 2014, incident with the mice that were found dead by her on that morning. In that case, she filed – and months and months to no avail. And this must have been tied to funds, otherwise there would have been no reason for them then to fix things when things were reported to NIH. I don't understand your point that we don't even know if there's a relevant funding contract here, because why else would they have said to NIH, we're going to fix this and fix it after she made her report? I do not dispute that there was a requirement to report to the NIH in order to get the funds. The maintenance of these activities were covered by – the maintenance of these animals was a condition of federal funds that Howard University had in hand, at least. Well, actually, if you look at the NIH's response to Ms. Singletary's email that she sent to them on April 15, it indicates that they are not even clear whether or not the animals that were affected by the incident were covered by the NIH grant after the report was submitted to them. So it was unclear to even the NIH. That's getting down to a pretty fine level of detail. I mean, the allegations and the complaints say, violation of terms and conditions of a funding grant. Sure. So we have to take that as a given. Sure. Right. So suppose, for example, suppose the allegations and the complaint covered 24 months instead of eight or nine, and that they were annual grants. So then we know that what she's talking – she's giving complaints that cover two years, and that every year there's a submission of a grant application that includes this condition about temperature. And she's saying, I've told you for two years that the temperature condition in the funding application is not being complied with. And so then we know also that at some point during that time span, a funding application was submitted. Would you still take the same position that even if it was a two-year period of complaints and they were annual grants, that there's still not a reasonable belief of a violation of the False Claims Act? I don't know. Oh, I apologize. No, that's okay. I don't know that I would say that I would still take the same tact in that instance, but I think the issue then becomes whether or not the behavior that she engaged in, the conduct that she engaged in, was actually protected activity and was outside the course of her normal job duties. There is a heightened standard that Ms. Sickletary had to meet and overcome in order to make her case that she was actually engaging in protected activity. And time and again she... What heightened standard? There's a heightened standard under Yusudian. Your 3.9b does not apply. Correct. Okay. But there's a heightened standard under Yusudian that when an employee engages in reporting activities that, quote, in accordance with her employment obligations, and, quote... Well, her complaint is quite clear that reporting to NIH was not in her wheelhouse. That was not her job. That's her complaint. Now, maybe this will be disputed. That sounds like a question of fact, but that doesn't help you right now. But her complaint is quite clear that the one who had that job was Dr.... Obesessen. Obesessen. Your Honor, to address that... So let's assume that's the case. Well, to address that point, they were all members of the IACUC, and as the sole veterinarian... But that is not... Her allegations are, which we are taking as true, but I guess you don't seem to want to, is that, yes, I'm on these committees, and that's why I was talking to people internally at least, but at least when it comes to talking to NIH, that was the institutional official or whatever the title was who had that job, and that was clearly identified as Dr. Obesessen. Obesessen. Obesessen. I apologize. So we just have to take that as a given. I don't deny that Dr. Obesessen was generally the one who was supposed to be... Generally, or the one designated for that job. He was designated for the communication. However, I don't think Dr. Singletary's email to the NIH could even come close to being something that would report fraud. That's a different argument. You are arguing for a heightened standard here, and I'm trying... So let's just focus on that right now, and I'm trying to say I don't understand, given the allegations of the complaint, for purposes of a 12b6 motion that we have that in front of us. Well, the guidelines for the NIH in these kinds of grants says that the I.O., the chair of the IAC, the veterinarian, are all supposed to be working together. That's not the same thing as who reports to the NIH. It's not the same thing, according to this complaint. I mean, this may be a fact dispute. I'm not saying that you don't... You may know how this works in practice. I'm confident you both know how this works in practice far more than I do, but according to the complaint, going to NIH was one person's job and it wasn't hers. So we assume there's no heightened pleading standard. I don't think... What happens then? Well, I still don't think... Even if there's no heightened pleading standard, even just the face of the email itself, and the NIH's reaction to the email does not indicate that it's a report of fraud. I mean, these are NIH grants. They deal with medical testing all of the time. There are incidents that occur just as a matter of course in scientific testing where those incidents have to be reported, and they were reported. And in this case, there's no indication in Dr. Singletary's email to the NIH that there was anything other than, I found that this incident occurred at 1045 this morning. I'm reporting it to you now. I have to now go back to the IO and the ACUC and report the issue to them so that a report can then be submitted to you. There's nothing other than that, and it's a very routine email. So that may be true of the email, the way you're describing it. I'm not necessarily sure that that matters at the end of the day. But if you look at the internal correspondence, so not the ones to NIH, the allegations in the complaint are that the internal complaints that were made to her supervisors, the other people involved in the enterprise, did relate the allegations to funding. Sure. Because they talked about violating... She said that she told people that were not in compliance with the terms and conditions of the funding agreement. Sure. And she is the director of veterinary, or she was the director of veterinary services at the university. She was the only attending veterinarian at the School of Medicine. Her sole duties were to take care of these animals. So I've got to say, I know there are cases and some cases say this. It's mystifying to me to some extent. So let's just put aside the part, just for me, for me, put aside the part of the cases that say it has to be outside your job responsibilities. Because if your job responsibility is reporting FCA violations, then I'm just not understanding why a complaint can't just say, what I told my supervisors was, there's fraud going on in connection with funding agreements. And then somehow that's not enough under the complaint. I don't understand that. So let's put that to one side and just look at the statute and what the allegations of the complaint say. And the allegations of the complaint say, I told people that we were not in compliance with terms and conditions of funding agreements. And then I think the question is, is that enough when the statute speaks in terms of violations of this subchapter, the False Claims Act? Well, that has to then go in connection with her allegations of saying, I reported this and then there was an actual certification that was made to the NIH that we were in compliance. And I continued to report that. So that's said in paragraph 43. Right. But there's no indication that she made a complaint and then a certification was made. There's no evidence or no facts that she's ever pled about who certified, when they certified, how they certified, that Howard University was in compliance. And what if the complaint says, it doesn't, but what if the complaint had said, yeah, you know, I don't know those details. I have no way of knowing those details. I'm not the person who does the funding applications or anything. I was concerned about it, though. I thought there might well have been a problem with false claims submitted to the government because what I saw was noncompliance. And I know that these things happen on a pretty regular basis. Would that be enough or would that not be enough? I don't believe that would be enough, Your Honor. I think there has to be some connection to, I have at least some idea that generally the NIH grant was, it comes due every time this year and we have to make a certification. I'm just talking in hypotheticals. But there has to be a certification made by the university in order to get the next set of funding. And I don't know when that might happen. The statute says stop, to stop something from happening. So she doesn't have to wait until it actually happens. Imagine another university, not your university, hypothetical university, submits its application for money and it has perfect temperature levels and everything. It gets the check. It gets the money. And Dr. Evil flips off the air conditioning as soon as they have the money and leaves it off until it's time to file for either an interim report or another request for money and flips it on. Would that be fraud under the False Claims Act? Well, Your Honor, let me put it this way. She alleges that... No, I don't want her allegations. I just want you to answer my hypothetical question. At the time the complaint was submitted, the air conditioning temperatures were just right. Every time they ask for money or file a report, the temperatures are just right. Every other time in between, they're not. Is that fraud under the False Claims Act? I can see in that hypothetical it could potentially be fraud. And so if someone tried to stop that and say, look, you have to cut this out, you're making a promise that you're going to keep them. As long as you've got this fund money and are using it, you're going to keep it at the level you promised. That would be an effort to stop fraud. Sure. But we don't have allegations like that here. It sounds a lot like her allegations. Well, I mean, her allegations are very broad. I mean, she says she made complaints. What part of that hypothetical I just gave you? Your hypothetical is not broad. But I think your hypothetical, frankly, is more detailed than the allegations in her complaint. Well, there's no dispute that Howard University obtained, submitted money and obtained funding and made promises about maintaining healthy living conditions, including not inflicting heat stroke on helpless animals, during the time it was going to have those funds. And then after it got that money, while she was there, it was not complying with that. And either a new report is going to go in at some point in short order. It can't be that too long goes by. We're getting close to a year here. Either a new claim is going to go in for more money or some sort of certification as to, yes, we are complying with our promises. It's going to be going in. And that's what she's trying to stop when she tells them, you made promises about these conditions and you're not keeping them. It feels to me exactly like this situation. Your Honor, I think part of the issue, just as a matter of practical speaking, we're talking about, you know, originally her allegations, I think, in her First Amendment complaint was that her complaints started in early 2014. She turned back the clock and made them beginning in mid-2013. We're taking this First Amendment complaint as true, right? Sure. So if you look at the mid-2013 to the April 2014 timeline, that eight-month period, where she's alleging there was no air conditioning to the facility. Well, she's just alleging that you weren't maintaining. We don't know the details, but it doesn't matter. She says you were not keeping the conditions as promised. Sure. Too hot, too cold, any of them would be wrong. Well, I mean, her allegations have always been that there's not conditioned air to the facility, to this entire period. She doesn't just say that it's the – Has I read the complaint? Go ahead. Well, she definitely thinks there's a violation of the terms and conditions of the agreement. Sure. So whether that's conditioned air or it's off by 0.4 degrees or it's off by 40 degrees, she is saying there's a violation of the conditions of the funding agreement. Sure. Right, so isn't that all that matters? Well, I think – but I think her allegations have to at least give us an idea. There has to be something more than this vague allegation that you just weren't complying. There has to be some allegations to indicate that she – Would a reasonable person think that there's going to be – you're going to have to file something once a year to get these funds, or would that be unreasonable to think? I think that would probably be unreasonable. Okay. And that if for the last eight months you haven't been complying with the promise you made last year, is it reasonable to think that when you submit that claim, say, in a few months to the government, you're not going to be telling the truth? Sure. I would assume that that was reasonable. Sure. So if there were an allegation, if she had just rounded it out and added something that says, and therefore I was concerned that in the next agreement, a representation would be made about compliance with a temperature condition that's not true, that you agree would have been enough? That's all that's missing here. I think what's missing here is any indication that she thinks we – there was a certification that was wrongful or fraudulent that was made at some point. She has some idea that this is – So if she made the representation that I just said, if she made the allegation that I just said, which has to do with the next cycle, then that would be enough? Probably, Your Honor. But she hasn't done that, and there has been plenty of opportunity for her to have done that over the last several years that this litigation has been pending. Well, for purposes of this case, this is just the second amended complaint. Right. Does your argument go to protected activity or the employer's knowledge or both? I thought you were primarily making the knowledge point from your brief. Sure. The way you're arguing it now, it seems like you're engaging mostly on a lack of protected activity, which is a tougher position for you, right? Sure. There could be a big difference between she could be engaged in protected activity, but the employer has no reason to know it. Right. Are you making both points? Yeah, and I am making both points. I think I was attempting to address the way that the court was questioning already on the case. But I think the issue, again, for Dr. Singletary is that the allegations of her alleged protected activity – I know Your Honor has indicated his – Sure, sure. But, you know, the case law does indicate that individuals who are engaging in activity that is within the scope of their job duties have to overcome a heightened standard in order to show that they were actually putting the employer on notice, that they were engaging in either investigating fraud – And trying to stop fraud. Right, or stopping, attempting to stop fraud. And I would argue that Dr. Singletary's arguments – or, not arguments, her complaints to Dr. Obasesson, her supervisor, to the other members of the IACUC, notifying them that there's an issue would not be enough to satisfy that standard or put them on notice. Then under the hypothetical complaint that we just had an exchange about, where she has an allegation that says, and because of all of this I was concerned that in the next cycle a representation would be made in connection with funding about compliance with the temperature condition that would be false, you'd say, actually that's not enough. Because there still wouldn't have been enough knowledge on the part of Howard University. Right, Your Honor. You'd still say that. Even though she's – Then what if she would have said, and I told people that. Again, I think it doesn't – even if she went to Dr. Obasesson and said, I don't think that the conditions are within the terms of our grant. She's the only veterinarian at the university. She doesn't only say that. She says, and I'm worried about our representation that we're going to be making in the next cycle. Again – That's still not knowledge? Well, that's still not enough to go outside of her – What more do they have to know? She's told them that I think we're violating the False Claims Act. How is that not knowledge? That's not normally a veterinarian's role. She might be taking care of animals, but it's not monitoring the False Claims Act compliance. And I know she says that they might be in violation of the regulations. They might be – but there's nothing in her pleadings that says she said specifically to them, I think there is a false claim here. I think anything like that – She specifically says we're in violation of allegations on which you get your funding, your funding conditions. Sure. But that's her – But that is – I mean, the reason she is at Howard University School of Medicine, she is the only veterinarian, is to be the one to say, I think there's an issue here. I think there's a potential violation. But paragraph 22, and this is sort of a veterinarian's job, she expressly noted that Howard was out of compliance with the terms and conditions under which it was receiving grant money from the federal government. That can't be your – that can't be what you say is missing here. It's J138 to 131, paragraph 22. I don't see why – I don't see why the sole – Dr. Obstessin is not a veterinarian. He is not charged with the care of these animals. Nobody else on the IACUC – And she's not a false claims act. I mean, she doesn't do funding claims for Howard University. So she's going outside her orbit as well. But the point is here, you know, we've said, you know what counts as notice, even under the heightened standards you want, is when you go outside the chain of command, which she did when Dr. Obstessin –  She went over his head to hire people, all right, and eventually went to NIH. So that factor is met under our case law. And when they – she kept repeatedly doing this over a long period of time. But that would assume that Dr. – But that would assume that Dr. Obstessin is also an expert in false claims and fraud. I don't believe that has to do with anything. Well, Your Honor, you were saying that she is a veterinarian. She is not tasked with being an expert in this. When she got nothing from him, she went over his head. And the case law says that simply going up the chain of command doesn't necessarily mean – Well, first of all, whether she went up to the chain of command is one thing. I mean, frankly, Dr. Obstessin was her direct supervisor, but she was also a voting member of the IACUC. So reporting these issues to other members of the IACUC doesn't mean she's going outside the chain of her command. Doesn't this just go back to Judge Srinivasan's original framing of the case, right? Which is, we have two clear data points in our case law on this point. One is, it's not enough to raise concerns about compliance with an underlying scheme, right? So if she's just complaining internally about violating the Animal Welfare Act, that's not enough. The other clear point is, it is enough if she's complaining internally about False Claims Act problems. If she had gone to them and said, this is a concern because certifications may be fraudulent and we're going to incur treble damages liability. That is enough. What she's done here is something in between, according to the allegations, which is she's complaining about compliance with a grant requirement that they be in conformity with the underlying animal welfare statute. And that seems to me it's an intermediate case, and it tees up the question, is that more a False Claims Act allegation about imminent fraud, or is it more an issue of animal welfare? And I think that is the point here, Your Honor. The point here is that her position was to take care of and protect these animals. And in doing that, if there were issues with the animals' care, with the animals' welfare, it was her responsibility internally at Howard, it was her responsibility under the regulations, under the Animal Welfare Act, and as a member of the IACUC, that she report those issues to try and address them. And frankly, if you look at her... Can you point me to anything in the record that shows that part of one of her duties was beyond caring for the animals, to disclose to anybody on this committee, or higher up in Howard University, when compliance with the terms of federal funding are not met? Was that in her wheelhouse or not? I think if you look at her job duties, she was... And that's part of the job offer that she submitted at 165 through 66. She had to establish and direct an in-house quality control program. She had to establish standard operating procedures to promote animal care, health, and welfare, including the proper quarters and animal housing equipment. She was supposed to collaborate with research investigators and physicians on all handling of animal care and experimental animals, including on housing. And I would say that establishing these quality control programs, establishing procedures, collaborating with physicians, is all a part of her obligation to make sure that the... She was supposed to monitor compliance with federal funding conditions by Howard University. No, Your Honor. Well, how about Arabic IV, which you haven't quoted a couple of lines down? Acts as consultant for grants to federal, city, and national institutions. Right. And as far as other... Requiring your expertise. Her expertise, as you just said, was consulting on medical conditions, not on compliance with terms of federal grants. Well, the only way she would know whether or not... She had an expertise in federal grants. No, but she had an expertise as to whether or not the animals were being kept in the conditions they were supposed to be and to report those. Absolutely. And she knew that, as a member of the IACUC, that she was supposed to be making sure that the university was keeping those animals well conditioned, and that was a part of their obligations as IACUC members. And the reason they were IACUC members is because they had NIH grants. The only reason that you have an IACUC set up at Howard University is because you have an NIH grant. And so if there is no... There's no basis for having that internal committee that's supposed to be monitoring the actions of the university and how they handle their animals and their testing procedures and all of that. There's no purpose in having that committee unless there is an NIH grant. And the reason she's on that committee is to make sure that they're complying with the rules and regulations of NIH in order to maintain that grant. I'm sorry. None of that is required by the Animal Welfare Act? It is. It's all part of... It all kind of gets lumped in together. Suppose they weren't taking grant money. Would they have to have the committee and the reporting official and the veterinarian and all of that? To be honest with you, Your Honor, I don't know. Not that I'm aware of, but I don't want to submit to anything that's incorrect. So the debate, then, is what's all the bucket of stuff that was within her normal job responsibilities and what's potentially a peripheral layer that's outside of it. But just to get back to one question, I'm going to make sure I'm clear on your answer. So we know the allegation in paragraph 22, which says that in her internal conversations, she expressly noted that Howard was out of compliance with the terms and conditions under which it was receiving grant money from the federal government. So we take that as a given. And if there were an extra allegation that perfected the point by saying, and in those internal discussions, I expressed concerns that because we've been out of compliance in the past, we'll make a representation in the future that's not true in a funding agreement, that would be enough. Even if you assume that all this stuff was within her job responsibilities, that would still be enough. Or would you say even in that situation, it still wouldn't be enough? Your Honor, I think if you could rephrase it. Yeah, so she has the allegation in here about terms and conditions. And what she says is, because that's what we're talking about here, I expressed concern that in light of the ongoing noncompliance, we would make a representation in a future funding cycle of compliance that is not true. I still don't think that would be enough, Your Honor, within the scope of her job duties. Because it's within the scope of her job duties, so the employer would need to, they could retaliate against her for that, and it still wouldn't be enough under the retaliation provision. Well, I don't think it's necessarily that. I think it's just that the university wouldn't necessarily, I mean, the purpose of requiring that heightened standard for people who are acting within the scope of their duties is that it's just like a compliance officer at just a regular company who is reporting, I think there might be fraud issues, I think there might be issues that if we certify for our grant or for whatever it might be down the road, we're going to have an issue here, and I know that certification is coming up. That's their job, that, you know, that's their job to notify their employer of that. And so just because she made those reports internally doesn't make it enough to meet that standard. I thought the point of the job description inquiry was to help frame the inquiry about employer notice. So if the job description, if she were an FCA compliance officer, and clearly within the scope of her job, she went to the university and said, we're at risk for FCA liability, that would be clearly within the scope of her responsibility, but clearly put them on notice. Well, not clearly, clearly put them on notice that she could potentially be, I mean, if that's the case, every time. And she's trying to, she's doing her job to stop FCA violations. Right, but the purpose, I mean, what companies, you know, the reason that entities have these individuals to do this work and make sure that they are complying and making sure that they are fulfilling both their job duties but also fulfilling the requirements of the entity, if every time the compliance officer comes to you and says, I think there's fraud and a violation, that the entity would then be on notice that they might be sued later on down the road or might have a complaint file against them, then it kind of... It's just to get past the pleadings. Sure. I mean, it may well be the case that it wasn't retaliation because of that. It might be that the person was late every single day for six months in a row. Right. But it's just, the only question is whether you get past the pleadings. Right. Even in a case of actual notice of a false claims act violation. But it sounds like your position is, even in that situation, the plaintiff doesn't get past the pleadings. Okay, all right. Thank you. I appreciate it. Thank you. Mr. Shoemaker, we'll give you two minutes before we're done. Yes, sir. The statute says, any effort to stop a violation of this subchapter. In Yasudian, the court said, and this is before the amendments, this court said that the FCA's anti-retaliation provision protects employees while they are collecting information about a possible fraud, before they have put all the pieces of the puzzle together. The court clearly said that in Yasudian. So, the language of the statute is, any effort to stop a violation of the subchapter, that could be an inchoate, nascent, unformed. It could not have occurred yet. And Yasudian drives that home. And it's interesting that they drove that home before the amendment. So, with respect to the issue, any stop, any effort from this subchapter, I think we clear that hurdle. With respect to employer notice, what better notice, what better proof of notice is there than their reaction to Dr. Singletary's email to NIH? She is excoriated in a faculty meeting. She is told she has humiliated Howard. Dr. Obisussen is incensed. All that is pled. Howard immediately acts to stop the violation after the email. The problem is stopped immediately, and almost as immediately, Dr. Singletary's contract is terminated. It's shortened by six months. The retaliatory act is taken. I know you're at the end of your time, but can I just follow up on this? If all you had was the email, and you didn't have any internal discussions at all, if all you had was the email, it sounds like you'd be making the argument you just made. But with the email itself, it does seem like there's a gap between noncompliance with expectations about temperature and anything having to do with the certification made to the government about in connection with funding. So the email just doesn't say anything about that. I would agree with you about that, Judge. But in totality, when you take the allegations in their totality, and as we must, the picture of unlawful retaliation in violation of 3730H we submit is clear. Thank you, Counsel. When she was in your allegations, she was telling, I don't know why I can't retain this name, Dr. Absazian about violations of SCA, and I think she may have said that to the people when she went over his head. Not Dr. Srinivasan. Not close. Suggested that, you know. At least I'm a doctor. Your name is a doctor. You know, another allegation that would say, and I was worried that there were going to be filings to get money, given this pattern of violations. I'm trying to figure out, he offered that hypothetical and you have allegations, but she said you all are violating your conditions for getting this funding. If those two connect up in your mind, or are they different things? That may not make any sense at all. I don't think that point is dispositive of. If it were, if it were, if there needed to be some indication that she was actually concerned that a false claim for money or a false representation about retained and continued use of money was going to be made. Do you read that? Do you see that in this complaint now? I'm just asking the question. I'm not saying that's the right answer. I'm just saying if that were what was required. I think it can be reasonably inferred from these allegations, which is fair on a 12B6 motion. I think it can absolutely be reasonably inferred from these allegations. That this concern is ongoing and it's continuing. She doesn't see an end to the concern until she sacrifices her career,  judge I'd add. She clearly saw the future problem. That was the reason for the sending of the email. Thank you, counsel. Thank you, counsel. Case is submitted.
judges: Srinivasan, Millett, Katsas